RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0131p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

———————————

ANDREW HESS,

    *Plaintiff-Appellant*,

    *v.*

OAKLAND COUNTY, MICHIGAN; KAREN MCDONALD,
Oakland County Prosecutor, Oakland County,
Michigan; MICHAEL J. BOUCHARD, Oakland County
Sheriff, Oakland County, Michigan; MATTHEW
PESCHKE, Sergeant, Oakland County Sheriff's Office,
Oakland County, Michigan,

    *Defendants-Appellees*.

No. 25-1784

———————————

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:25-cv-10665—Gershwin A. Drain, District Judge.

Argued:  March 19, 2026

Decided and Filed:  May 5, 2026

Before:  BOGGS, READLER, and DAVIS, Circuit Judges.

———————————

## COUNSEL

**ARGUED:**  Robert Joseph Muise, AMERICAN FREEDOM LAW CENTER, Ann Arbor,
Michigan, for Appellant.  Zachary C. Larsen, CLARK HILL PLC, Lansing, Michigan, for
Appellees.  **ON BRIEF:**  Robert Joseph Muise, AMERICAN FREEDOM LAW CENTER, Ann
Arbor, Michigan, for Appellant.  Robert N. Dare, CLARK HILL PLC, Lansing, Michigan, for
Appellees.

---

**OPINION**

---

BOGGS, Circuit Judge.  In December 2023, Andrew Hess attended an election recount conducted in an office at the Oakland County, Michigan, courthouse.  He raised allegations of ballot-box tampering to the county's director of elections, Joseph Rozell.  Unsatisfied with Rozell's assurances, Hess exited the recount room and entered the lobby of the courthouse, where he said "hang Joe for treason" to a fellow member of the public.  Although Hess was allowed to remain at the recount, Oakland County prosecutors charged him with a felony months later under Michigan's terrorist-threat statute based on that comment.  Hess's charge was dismissed after the Michigan Court of Appeals, in a different case, held the state's terrorist-threat statute facially unconstitutional.  Hess then filed a 42 U.S.C. § 1983 suit in the Eastern District of Michigan, including a claim that the attempted prosecution violated his First Amendment rights.

The Michigan Supreme Court reversed the Court of Appeals, however, and state-court litigation continues to define the boundaries of the terrorist-threat statute's constitutionality. That reversal revived the possibility that Oakland County could prosecute Hess under the terrorist-threat statute after all.  Seeking to forestall this possibility, Hess requested one of the most dramatic remedies in a federal court's arsenal: a preliminary injunction against a threatened criminal prosecution by a separate sovereign.  The district court denied his motion.  We agree with Hess that he is likely to succeed on the merits of his claim that his "hang Joe for treason" statement constituted protected speech, not a true threat.  But because the threatened prosecution targets only his *past* speech, as opposed to his *future* speech, and because state-court procedures afford expeditious opportunities to litigate a First Amendment defense, he has failed to show irreparable harm.  We therefore affirm the denial of his requested preliminary injunction.

**I**

**A**

We recite the facts based on the record presented to the district court, drawing primarily on police reports and testimony from preliminary hearings in Hess's state prosecution.

The 2023 local elections in Royal Oak, Michigan, included a ballot question about whether to adopt ranked-choice voting to elect certain municipal positions. A close tally prompted a recount, supervised by Oakland County Director of Elections Joseph Rozell. The recount occurred on December 15, 2023, at the Oakland County Courthouse. Andrew Hess attended the recount, having been "selected as an observer," according to Rozell. (Rozell did not specify who selected Hess as an observer, or under what procedures.) R. 12-2, PageID 126. Other county employees, sheriff's officers, and members of the public also were present. R. 23, PageID 522.

Hess and Rozell had met before. In late 2022, Hess attended the Oakland County recount for two state constitutional propositions. Hess, along with two other individuals, confronted Rozell during the recount to request changes to ballot-examination procedures. When Rozell declined, citing state law, Hess "demanded" that sheriff's officers arrest Rozell "for interfering with the conduct of the recount." Officers declined to take any action, and Rozell resumed supervising the recount without further incident. R. 12-2, PageID 112–13, 118–121.

Hess and Rozell would not meet again until the December 2023 recount, when Hess alleged that someone had tampered with one of the ballot boxes. Rozell's confirmation that the ballot box had remained within the county's chain of custody did not assuage Hess's concerns, prompting Hess to tell Rozell: "Treason is going to look very good on you." *Id.* at PageID 128. Rozell later would testify that Hess "seemed agitated when I told him that we were going to move forward with the recount," but Rozell did not seek Hess's arrest or removal. *Id.* at PageID 130, 156–57. Hess remained at his observer's table, and Rozell walked away. *Id.* at PageID 128. Shortly afterwards, one of the county's attorneys relocated to a restricted-access table in the recount room, leading Hess to question why the attorney "gets to be there, but I don't." *Id.* at PageID 129. Once again Rozell dismissed Hess's objection, and the conversation ended. *Ibid.*

At some point following these interactions, but while the recount continued, Hess exited the recount room and entered the lobby, where Kaitlyn Howard was on duty as a receptionist. The doors between the lobby and the recount room remained open. *Id.* at PageID 170–71. It appears that only three people were in the lobby at this time: Hess, Howard, and a third

individual who Howard recognized as Braden Giobachi,[1] a member of the public who frequently contacted the Oakland County elections office. *Id.* at PageID 172–73. Rozell remained in the recount room, as did all members of the Board of Canvassers. *Id.* at PageID 142, 185. Howard alleged that she overheard Hess tell the third individual "[h]ang Joe for treason" in what a prosecutor stipulated as a "normal conversational tone." *Id.* at PageID 172–74. According to Howard, Giobachi responded, "[t]hat's too much." *Id.* at PageID 176. No other witness to this exchange has emerged.

Hess returned to the recount room. Howard refrained from taking immediate action, explaining that she "couldn't leave [her] position at the front desk" because she "was the only one guarding it." *Id.* at PageID 176. Although Howard would concede that she did not perceive "any imminent harm" and that Hess had not directed his comment toward her, Howard eventually reported Hess's comment to Sheriff's Officer Lee Van Camp because she did not "take kindly to that kind of behavior or language." *Id.* at PageID 178–181.

Officer Van Camp asked Hess to speak with him in the lobby. Hess agreed and nodded when the officer asked whether he had said "hang Joe for treason." Hess explained that "all [he] did was accuse [Rozell] of a crime" and that hanging is the penalty for treason. R. 16-3, PageID 249. Officer Van Camp allowed Hess to reenter the recount room, where Hess addressed Rozell during a public-comment period. Hess concluded by stating: "what is the penalty for treason[?] I'll let somebody else tell you what it is." R. 16, PageID 221. Hess then departed the premises voluntarily; neither Rozell nor any official ever requested Hess's removal. R. 12-2, PageID 156–60.

At some point after Hess left, Officer Van Camp approached Rozell to inform him that Hess had said "hang Joe for treason" in the lobby. R. 16, PageID 222. Although Rozell never heard that comment firsthand nor observed any visible signs of a threat, he later testified that he felt "in shock" and notified police in his home jurisdiction to request extra patrols by his residence. R. 12-2, PageID 137–38, 162. Hess and Rozell have not interacted since the recount.

---

[1]The preliminary-examination transcript cautions that this is a phonetic spelling of this individual's name.

**B**

On April 1, 2024, more than three months after the recount proceedings, Oakland County Prosecuting Attorney Karen McDonald charged Hess under Michigan's terrorist-threat statute based on his "hang Joe for treason" statement. R. 1-3, PageID 38. The statute provides that a person "is guilty of making a terrorist threat" if he "[t]hreatens to commit an act of terrorism and communicates the threat to any other person." Mich. Comp. Laws § 750.543m(1)(a). It defines an "[a]ct of terrorism" as "a willful and deliberate act" that "would be a violent felony" under Michigan law, that "the person knows or has reason to know is dangerous," and that "is intended to intimidate or coerce a civilian population or influence or affect the conduct of government . . . through intimidation or coercion." *Id.* § 750.543b(a)(i)–(iii). Violations are punishable by a maximum 20 years of imprisonment and $20,000 fine. *Id.* § 750.543m(3).

An arrest warrant for Hess issued on April 4. Hess was released pending trial on a personal-recognizance bond with conditions requiring him to refrain from contacting Rozell, abstain from drugs and alcohol, and surrender his firearms. R. 12-2, PageID 199. The state trial court conducted a preliminary examination on May 30, 2024, where Rozell and Howard testified. The court continued the examination to September 6, 2024, where it found probable cause after hearing argument from counsel. R. 22-3, PageID 449.

While Hess's prosecution continued, the Michigan Court of Appeals struck down § 750.543m(1)(a) as facially unconstitutional because "there is no statutory language suggesting that the prosecutor must prove that the defendant consciously disregarded a substantial risk that his communications would be viewed as threatening violence." *People v. Kvasnicka (Kvasnicka I)*, No. 371542, 2025 WL 492469, at *4 (Mich. Ct. App. Feb. 13, 2025). It reached this conclusion by applying the Supreme Court's most recent true-threat precedent, which requires prosecutors to prove that "the defendant had some understanding of his statements' threatening character" by at least a standard of recklessness. *Counterman v. Colorado*, 600 U.S. 66, 72–73 (2023).

*Kvasnicka I* prompted Hess to move to dismiss his charge. Prosecutors opposed Hess's motion to dismiss, filing instead a motion to stay proceedings against Hess pending further

developments in the *Kvasnicka* litigation. The state trial court sided with Hess and dismissed the charge on March 6, 2025. D. 20 at 14.

On March 10, Hess filed the instant § 1983 suit in the Eastern District of Michigan, naming Oakland County, McDonald, Rozell, Oakland County Sheriff Michael Bouchard, and Oakland County Sergeant Matthew Peschke as defendants. Seeking declaratory and injunctive relief and monetary damages, he brought claims for violations of his rights under the First, Second, Fourth, and Fourteenth Amendments, plus state-law tort claims.

Soon after filing his federal complaint, Hess began to fear that McDonald might try to revive the case against him. On March 28, 2025, the Michigan Supreme Court vacated the appellate court's judgment and remanded with instructions to interpret § 750.543m(1)(a) in light of § 750.543z, which provides that "a prosecuting agency shall not prosecute any person or seize any property for conduct presumptively protected" by the First Amendment. *People v. Kvasnicka (Kvasnicka II)*, 18 N.W.3d 308, 308–09 (Mich. 2025) (mem.). Perceiving "the continuing threat of arrest and prosecution under § 750.543m for his political speech," Hess requested that the federal district court "enjoin the enforcement of [the statute] as applied to [Hess's] political speech while [Hess's civil] case proceeds." R. 12, PageID 64–67. Before the district court ruled on Hess's motion, the Michigan Court of Appeals changed course to uphold § 750.543m(1)(a) as facially constitutional by implying a recklessness mens rea. *People v. Kvasnicka (Kvasnicka III)*, No. 371542, 2025 WL 2045006, at *6 & n.2 (Mich. Ct. App. July 21, 2025).

Hess's motion for a preliminary injunction "relie[d] solely on his First Amendment claim" and argued "that prosecution under § 750.543m(1)(a) is facially unconstitutional under *Brandenburg v. Ohio*, 395 U.S. 444 (1969) [(per curiam)], and unconstitutional as applied to him because his speech did not constitute a 'true threat' under the circumstances." R. 36, PageID 881. The district court denied Hess's motion on August 29, 2025, concluding that Hess could not demonstrate a likelihood of success on the merits of his First Amendment claims. Specifically, the district court found that Hess is "not likely to succeed" on his *Brandenburg* claim, *id.* at PageID 886, and that "the likelihood of success factor is neutral" regarding his true-threat argument, *id.* at PageID 893.

Three important developments have since occurred.  First, on October 6, McDonald filed a motion with the Michigan trial court to "reinstate" the charge against Hess.  D. 20 at 13–15. That motion remains outstanding, because the parties have agreed to a "stipulation of adjourning all state-court proceedings" until this interlocutory appeal concludes.  Argument Tr. 1:00–2:10. Second, on October 24, the district court denied in part the civil defendants' motion to dismiss, allowing Hess's First Amendment claim to proceed "against Defendants McDonald, Bouchard, and Peschke for declaratory and injunctive relief, and Defendant Rozell for all relief."[2]  R. 43, PageID 911.    Both of Hess's theories for obtaining a preliminary injunction—that § 750.543m(1)(a) is facially unconstitutional under the Supreme Court's incitement precedents, and unconstitutional as applied to him because he did not communicate a true threat—survived the motion to dismiss.  *Id.* at PageID 927–33.  Finally, on December 29, the Michigan Supreme Court announced that it would hold oral argument to review the interpretation of § 750.543m(1)(a) adopted in *Kvasnicka III*.  *People v. Kvasnicka (Kvasnicka IV)*, 28 N.W.3d 710 (Mich. 2025) (mem.).

## II

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008).  We review the district court's denial of the preliminary-injunction motion for abuse of discretion, although we review its underlying First Amendment analysis de novo.  *O'Toole v. O'Connor*, 802 F.3d 783, 788 (6th Cir. 2015).

As with any preliminary-injunction motion, Hess bears the burden of making a "clear showing that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'"  *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (quoting *Winter*, 555 U.S. at 20, 22).  But although the traditional four factors apply, Hess faces an especially demanding gauntlet because "[i]t is a familiar rule that courts of equity do not ordinarily restrain criminal prosecutions."  *Trump v. United States*, 54 F.4th 689, 697 (11th Cir.

---

[2]The district court also dismissed Oakland County as a defendant.  R. 43, PageID 911.  Accordingly, we refer to the requested injunctive relief as running against McDonald.

2022) (per curiam) (quoting *Douglas v. City of Jeannette*, 319 U.S. 157, 163 (1943)); *see also Fischer v. Thomas*, 78 F.4th 864, 869 (6th Cir. 2023).

Adding to his burden, Hess asks us to restrain not merely a prosecution by a coordinate branch of government, but rather by a separate sovereign. Such a request raises special concerns for "Our Federalism." *Younger v. Harris*, 401 U.S. 37, 44 (1971). To be sure, we need not abstain from exercising our jurisdiction, because Hess initiated his § 1983 action in federal court *after* the Michigan trial court dismissed the criminal case against him, and because "proceedings of substance on the merits have taken place in the federal court" *before* state criminal proceedings recommenced. *Hicks v. Miranda*, 422 U.S. 332, 349 (1975). McDonald did not move to reinstate the charge until after the district court resolved Hess's preliminary-injunction motion on a reasonably well-developed record, which suffices for a proceeding of substance on the merits. *See Fischer*, 78 F.4th at 869 (citing *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 238 (1984)). But although Hess is entitled to have his claim "considered without regard to *Younger*'s restrictions," the requested injunction nevertheless would "seriously impair[] the State's interest in enforcing its criminal laws, and implicates the concerns for federalism which lie at the heart of *Younger*." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975).

Hess asserts, in part, that he is likely to succeed on the merits because his "hang Joe for treason" statement did not constitute a true threat. He claims that a revived prosecution for that past statement—which would expose him to restrictive bail conditions and, potentially, decades in prison—would inflict irreparable harm. We agree with his assessment of the merits but disagree with his irreparable-harm analysis, based on (1) the distinction between threatened enforcement against *past* speech as opposed to *future* speech and (2) the availability of expeditious state-court procedures to litigate his First Amendment defense.

**A**

Hess presses two theories explaining why prosecution for his "hang Joe for treason" comment would violate his freedom of speech. First, Hess argues that Michigan's terrorist-threat statute is facially unconstitutional under *Brandenburg* because the statute does not require prosecutors to prove that the speech "be directed to inciting or producing imminent lawless

action and likely to incite or produce such action." Appellant Br. 16. Second, Hess asserts an as-applied constitutional challenge that his speech did not constitute a true threat. *See id.* at 18. His first theory will likely fail, but his second will likely succeed.

Starting with Hess's facial challenge, "a statute is facially invalid under the First Amendment only if its 'unconstitutional applications' are 'substantially disproportionate to the statute's lawful sweep.'" *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 481 n.7 (2025) (quoting *United States v. Hansen*, 599 U.S. 762, 770 (2023)). Incitement and true threats represent two of the "few limited areas" where the First Amendment permits content-based speech restrictions. *Counterman*, 600 U.S. at 73 (citation omitted). Incitement refers to "statements 'directed [at] producing imminent lawless action,' and likely to do so." *Ibid.* (alteration in original) (quoting *Brandenburg*, 395 U.S. at 447). True threats, in contrast, are "'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful violence.'" *Id.* at 74 (alteration in original) (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003)).

Incitement receives greater protection than true threats because "incitement to disorder is commonly a hair's-breadth away from political 'advocacy.'" *Id.* at 81 (citation omitted). To obtain a conviction under a theory of incitement, prosecutors must prove not only that the speech is directed at producing imminent lawless action and likely to do so, but also that the speaker acted with "specific intent, presumably equivalent to purpose or knowledge," to produce such lawless action. *Ibid.* True threats, however, are sanctionable even if the speech is not directed at producing, or likely to produce, imminent lawless action and require prosecutors to prove only a mental state of recklessness. *Id.* at 81–82. In other words, while both incitement and true threats can facilitate a threat of violence, a true threat does not require that the speaker "prepar[e] a group for violent action and steel[] it to such action." *Brandenburg*, 395 U.S. at 447–48 (quoting *Noto v. United States*, 367 U.S. 290, 297–98 (1961)). The absence of group advocacy, with its often-political character, justifies the lower mens rea in the true-threats context, *see Counterman*, 600 U.S. at 81–82, even though true threats can arise from political disputes that test the boundaries of protected "political hyperbole," *Watts v. United States*, 394 U.S. 705, 708 (1969) (per curiam).

Hess's facial challenge fails because Michigan's terrorist-threat statute criminalizes true threats, not incitement.  However much some speech might straddle these categories, Michigan courts have never interpreted § 750.543m(1)(a) as anything other than a true-threats statute.  *See People v. Osantowski*, 736 N.W.2d 289, 302–04 (Mich. Ct. App. 2007), *rev'd on other grounds*, 748 N.W.2d 799 (Mich. 2008); *Kvasnicka III*, 2025 WL 2045006, at *4 (collecting cases).  This dooms Hess's claim that the statute is facially unconstitutional under *Brandenburg*, because the statute's "lawful sweep" only encompasses circumstances that do not require prosecutors to prove imminent lawlessness and specific intent.  *Free Speech Coal.*, 606 U.S. at 481 n.7; *see Speet v. Schuette*, 726 F.3d 867, 871–72 (6th Cir. 2013).  Although the statute would require prosecutors to prove that Hess made his statement with the intent to "affect the conduct of government or a unit of government through intimidation or coercion," Mich. Comp. Laws § 750.543b(a)(iii), that element supports a true-threat theory of liability.  After all, "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death."  *Black*, 538 U.S. at 360.  The district court correctly found Hess unlikely to succeed on his facial *Brandenburg* argument.

We agree with Hess, however, that he will likely succeed on his alternative claim that he did not express a true threat by saying "hang Joe for treason" in a "normal conversational tone" made outside of Rozell's presence, in what Hess believed was a private remark to Giobachi.  R. 12-2, PageID 174.  Before explaining that conclusion, we pause to address our authority to decide this question.

McDonald emphasizes that juries, not judges, typically decide whether speech constitutes a true threat.  *See, e.g.*, *United States v. Howard*, 947 F.3d 936, 947–49 (6th Cir. 2020); *Thames v. City of Westland*, 796 F. App'x 251, 262 (6th Cir. 2019); *Osantowski*, 736 N.W.2d at 302.  But as in any setting, courts retain the power to remove a true-threat question from the jury's consideration, or override its verdict, if the evidence shows that the speech was protected as a matter of law.  *Watts*, 394 U.S. at 706, 708 (reversing a draft-eligible protester's conviction for his statement, made on the grounds of the Washington Monument, that "[i]f they ever make me carry a rifle the first man I want to get in my sights is L.B.J.").  And the potential empaneling of

a jury, in either Hess's federal civil case or in a revived state prosecution, does not prevent us from assessing Hess's likelihood of success on the merits based on the evidence available now—even if the jury might reach a contrary verdict. *Compare, e.g.*, *ACT, Inc. v. Worldwide Interactive Network, Inc.*, 46 F.4th 489, 499–503 (6th Cir. 2022) (finding the *plaintiff* likely to succeed on the merits of its copyright-infringement claim) *with* Jury Verdict, *ACT, Inc.*, No. 3:18-cv-00186 (E. D. Tenn. Sep. 9, 2022), Dkt. No. 718 (subsequently finding for the *defendant*).

Returning to Hess's speech, this case implicates the "profound national commitment" to public debate that "may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Watts*, 394 U.S. at 708 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). But just as the First Amendment permits a wide range of "political hyperbole," *ibid.*, it also "protects individuals from the fear of violence and from the disruption that fear engenders," as well as "from the possibility that the threatened violence will occur," *Black*, 538 U.S. at 360 (citation modified).

A true threat is "a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Id.* at 359. "The speaker need not actually intend to carry out the threat." *Id.* at 359–60. Rather, whether a statement rises to a true threat depends on its "objective content" and what it conveys to the recipient. *Counterman*, 600 U.S. at 72–74; *see also Elonis v. United States*, 575 U.S. 723, 733 (2015). The speaker must make the statement recklessly, "mean[ing] that a speaker is aware 'that others could regard his statements as' threatening violence and 'delivers them anyway.'" *Counterman*, 600 U.S. at 79 (quoting *Elonis*, 575 U.S. at 746 (Alito, J., concurring in part and dissenting in part)).

Many factors inform whether a statement counts as a true threat. The statement's context, express or conditional nature, and the listeners' reactions matter. *See Watts*, 394 U.S. at 708; *Howard*, 947 F.3d at 947–48 (affirming a defendant's conviction for leaving a threatening voicemail to a former government official because the statement, "'I'm going to kill you. I am going to murder you[,]' . . . could not have been any clearer in [its] threat"). Although the "listener's subjective fear alone is not enough to turn an innocuous statement into a true threat," a statement is more likely to count as a true threat if the listener is "alarmed enough" to

immediately alert authorities. *Thames*, 796 F. App'x at 262 (emphasis removed). Other variables include the statement's specificity, audience (intended or otherwise), location, and tone, in addition to any history of prior "conflict" between the speaker and the statement's target. *See ibid.*; *United States v. Censke*, 449 F. App'x 456, 467 (6th Cir. 2011). The target of the speech need not hear it first-hand for the statement to count as a true threat, *United States v. Houston*, 683 F. App'x 434, 438–39 (6th Cir. 2017), but distance between the speaker and recipient may tend to diminish a statement's threatening nature, *see Watts*, 394 U.S. at 705–06.

Hess's "hang Joe for treason" statement likely did not constitute a true threat. He spoke in a highly charged political atmosphere, which heightens the need to distinguish between true threats and mere hyperbole. *See id.* at 708. His invocation of an archaic form of punishment rather than a common, modern device suggests the latter. *See Thames*, 796 F. App'x at 262 (distinguishing between someone who threatens with "bombs" rather than "brimstone"). Although not dispositive, Rozell never heard the threat directly. By removing himself to the lobby, speaking in a "normal conversational tone," and directing his comment only to Giobachi, Hess lowered the statement's temperature and the likelihood that it would reach Rozell, directly or secondhand. R. 12-2, PageID 174; *see Thames*, 796 F. App'x at 262. By removing himself from direct contact with Rozell and other recount officials, Hess likely did not consciously disregard a substantial and unjustifiable risk that his statement would be viewed as endangering Rozell. *See Counterman*, 600 U.S. at 79.

Additionally, neither of the individuals who directly heard Hess's comment seemed especially concerned. *See Thames*, 796 F. App'x at 262. Giobachi replied, "[t]hat's too much," but took no action. R. 12-2, PageID 176. Howard, the secretary, *did* relay the comment to officers, but not immediately, and she reported only because she took offense (she did not "take kindly to that kind of behavior or language"), not because she feared violence. *Id.* at PageID 178. The officers did not perceive a threat either; after interviewing Hess, they allowed him to return to the recount room and address Rozell during public comment. And Rozell himself never felt threatened by anything Hess said to him directly, either during the 2022 or 2023 recounts.

To be sure, some facts cut against Hess. None do so forcefully, however. Rozell and Hess had a history of conflict, *see Censke*, 449 F. App'x at 467, but their interactions always

resolved peacefully and Rozell never sought to eject Hess from official proceedings.  Rozell also testified that he felt in "shock" and requested police protection upon later learning of Hess's comment.  Yet, even though an "alarmed" and "sincere" reaction is "meaningful," it cannot suffice "to turn an innocuous statement into a true threat."  *Thames*, 796 F. App'x at 262 (emphasis removed).  And, although Hess chose to speak in a courthouse lobby, a sensitive place where Rozell, other officials, or the public could have overheard his speech, Hess apparently intended to address Giobachi privately.  Thus, Hess has a strong case, on balance, that his comments did not constitute a true threat.

Contrary to the district court, we find that Hess's likelihood of success on the merits of his as-applied true-threat argument is far better than "neutral."  R. 36, PageID 893.  Because most listeners would likely consider Hess's comment hyperbole rather than "a serious expression of an intent to commit an act of unlawful violence," *Black*, 538 U.S. at 359, Hess is likely to succeed on the merits of his claim that he engaged in protected speech.

**B**

Hess must also demonstrate that he would likely incur irreparable harm, an essential prerequisite for obtaining preliminary injunctive relief.  *EOG Res., Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 883 (6th Cir. 2025).  He claims that he would suffer irreparable harm from the threatened prosecution based on, in his view, protected speech.  But while the threat of prosecution based on *future* speech risks irreparable harm, the threat of prosecution based on *past* speech does not.  And Hess has made no showing, at least not with any specificity, that the terrorist-threat statute will chill his future speech.  Perhaps the threat of prosecution based on past speech could risk irreparable harm in some contexts, but not so here, because Hess can avail himself of expeditious state-court procedures to litigate his First Amendment defense against a good-faith prosecution.

Generally, injunctive relief is available only when the threat of enforcement chills *future* speech.  *See Bays v. City of Fairborn*, 668 F.3d 814, 818, 825 (6th Cir. 2012) (granting preliminary injunction to plaintiffs who challenged an anti-pamphleting policy at a local festival rather than forcing plaintiffs to challenge the policy by pamphleting and risking arrest).  A mere

fear of enforcement based on *past* speech does not risk causing irreparable harm to the speaker's First Amendment rights because it does not impair his future conduct. *Fischer*, 78 F.4th at 868–69 (denying a preliminary injunction to former political candidates who failed to show an "immediate" risk of chill but rather sought to enjoin threatened state investigation into speech that they made during a prior election (citation omitted)). This distinction between future and past speech in the preliminary-injunction context comports with the notion that even a minimal infringement of First Amendment freedoms constitutes irreparable harm. *Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 158 F.4th 732, 760 (6th Cir. 2025) (en banc). When the government chills speech *ex ante*, it deprives the speaker of the opportunity to timely express his political views and deprives the community of the opportunity to timely consider his perspective. *See Elrod v. Burns*, 427 U.S. 347, 373–74 & n.29 (1976) (plurality opinion). When the government attempts to punish speech *ex post*, however, the speaker has still expressed himself, the community has still received his wisdom, and the legal process can compensate him for any unlawful enforcement. *Fischer*, 78 F.4th at 869 (explaining that if a court ultimately "finds that the past speech was protected, then the appropriate remedy is damages, not an injunction"); *cf. Blackwell v. Nocerini*, 123 F.4th 479, 488–89, 492 (6th Cir. 2024) (affirming the denial of qualified immunity to city officials who allegedly "induced" the prosecution of a plaintiff for charges that the plaintiff alleged reflected retaliation against his political speech).

Hess fears punishment solely for his past speech. The "only speech threatened by the [state's] proceedings [here, 'hang Joe for treason'] has already occurred." *Fischer*, 78 F.4th at 869. So the threat of prosecution for past speech has not impaired his "ability to speak 'at the time relief was sought.'" *Id.* at 868–69 (quoting *Elrod*, 427 U.S. at 373). In other words, Hess need not choose "between the Scylla of intentionally flouting state law and the Charybdis of forgoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding." *Steffel v. Thompson*, 415 U.S. 452, 462 (1974).

Indeed, Hess has failed to identify speech that he wishes to make in the future but for the threat of prosecution of that *future* speech. He offers only a generalized desire to continue criticizing perceived election irregularities in the future, leaving us to speculate about what he might say and how the terrorist-threat statute might proscribe it. Hess hypothesizes far more

uncertain downstream effects than those confronting pamphleteers who know exactly where they want to canvass and exactly how an ordinance forbids their plans. *See id.* at 455–56; *Bays*, 668 F.3d at 818. True, prosecution for his remarks at the 2023 recount might trigger pretrial restrictions against contacting Rozell, as the state court once imposed. Hess, however, does not clearly raise that argument in his briefs, let alone suggest that he otherwise would contact Rozell in the future. *See Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624–25 (6th Cir. 2013). Nor does that tailored restraint against contacting an alleged victim likely differ from the type of restriction inherent in any prosecution. *See Younger*, 401 U.S. at 46. Should the state trial court impose more restrictive conditions on his speech, or if Hess musters a more concrete example of how the terrorist-threat statute deters his future speech, he "can renew [his] request for preliminary relief then." *Fischer*, 78 F.4th at 868.

Because Hess cannot identify a risk of irreparable harm to his ability to speak prospectively, he instead invokes "the trials and tribulations" that a felony charge inflicts "well before a jury is empaneled." Appellant Br. 40. But even though we assess this case "without regard" to *Younger* abstention, the Supreme Court has nonetheless stated that any attempt to enjoin state criminal proceedings "implicates the concerns for federalism which lie at the heart of *Younger*." *Doran*, 422 U.S. at 931. For that reason, "the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution alone do not constitute 'irreparable injury' in the 'special legal sense of that term.'" *Kugler v. Helfant*, 421 U.S. 117, 124 (1975) (quoting *Younger*, 401 U.S. at 46). This general rule permits at least three exceptions—including when the criminal forum would provide inadequate procedures to litigate constitutional defenses, when the prosecution acts in bad faith, or when the prosecution appears flagrantly unconstitutional— but none applies here. *See Trainor v. Hernandez*, 431 U.S. 434, 442–43 & n.7 (1977) (explaining that these circumstances can justify injunctive relief even in a context when a federal court should ordinarily abstain).

First, Michigan courts "provide[] the accused a fair and sufficient opportunity for vindication of federal constitutional rights." *Kugler*, 421 U.S. at 124. They have demonstrated sensitivity to the Supreme Court's true-threat precedents and defendants' First Amendment rights when interpreting § 750.543m(1)(a). *See, e.g.*, *People v. Burkman*, 15 N.W.3d 216, 333 (Mich.

2024) (holding that defendants' comments were not true threats); *Kvasnicka III*, 2025 WL 2045006, at *6 (construing § 750.543m(1)(a) in light of *Counterman* to imply a mens rea of recklessness); *People v. Johnson*, 986 N.W.2d 672, 679–80 (Mich. Ct. App. 2022) (remanding for a new trial where the trial court gave a jury instruction that "lack[ed] language necessary to avoid infringement of the First Amendment"). They have even granted expedited appellate review to resolve First Amendment defenses early in true-threat cases. *See, e.g.*, *People v. Gerhard*, 976 N.W.2d 907, 909 (Mich. Ct. App. 2021) (accepting interlocutory appeal of a denial of the defendant's motion to quash a § 750.543m(1)(a) charge). The Michigan Supreme Court could hold § 750.543m(1)(a) facially unconstitutional. *See Kvasnicka IV*, 28 N.W.3d at 710 (ordering oral argument on that issue). Hess will have ample opportunity to litigate a First Amendment defense long before ever reaching a jury.

Second, Hess has failed to make the "exceedingly rare" showing of prosecutorial bad faith. *Tindall v. Wayne Cnty. Friend of Ct.*, 269 F.3d 533, 539 (6th Cir. 2001). Mustering an argument that he did not include in his preliminary-injunction motion below (but that he did present in his since-dismissed Equal Protection Clause claim), Hess decries what he perceives as inconsistent enforcement against "rough and tumble" speech. Reply Br. 14–17. This selective-prosecution argument alleges that McDonald (an elected Democrat) has refused to enforce the terrorist-threat statute against her likeminded fellow citizens. It requires Hess to prove selective targeting, discriminatory purpose, and discriminatory effect. *Rieves v. Town of Smyrna*, 959 F.3d 678, 700 (6th Cir. 2020). The first element asks whether "similarly situated organizations and individuals, of a different political viewpoint, have not been subject to the same alleged treatment by Defendants." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011). The second element assesses the prosecution's motives, and the third considers whether the selective targeting has produced a discriminatory effect on the defendant's "identifiable group." *See Rieves*, 959 F.3d at 700 (quoting *Stemler v. City of Florence*, 126 F.3d 856, 873 (6th Cir. 1997)).

Even assuming that we can consider this delayed theory premised on a dismissed claim, it fails. Hess offered two comparator groups: social-media posts from the Lenawee County Democratic Party calling President Donald Trump a "traitor who deserves the full measure of

punishment as outlined in the Constitution," and protestors displaying signs accusing the president of being a "traitor" and reading "86 47." Reply Br. 15–16; R. 43, PageID 944–45. Dismissing Hess's Equal Protection claim, the district court found neither group similarly situated, terminating the selective-prosecution analysis at the first step. R. 43, PageID 944–45. The distinction between Hess and the social-media posters was certainly appropriate because Michigan law more clearly authorizes venue in Oakland County for Hess's within-jurisdiction statement than for the out-of-county posts. *See People v. McBurrows*, 934 N.W.2d 748, 751–53 (Mich. 2019). The distinction between Hess and the protesters may present a closer call, but even assuming that they are similarly situated, Hess has offered no evidence suggesting that McDonald acted with discriminatory purpose or that Hess's own political group (which he makes no effort to define) has suffered discriminatory effects.

Third, we cannot categorically exclude the possibility that the law and facts will ultimately support McDonald's true-threats theory. The ongoing *Kvasnicka* litigation prevents us from declaring the terrorist-threat statute "flagrantly and patently" unconstitutional such that we must rescue Hess from prosecution. *Younger*, 401 U.S. at 53–54 (quoting *Watson v. Buck*, 313 U.S. 387, 402 (1941)). The statute's unsettled construction, combined with a factual record that sufficed for the earlier state court to find probable cause in Hess's case, indicates that the state does not utterly lack "a reasonable expectation of obtaining a valid conviction" despite our skepticism. *Kugler*, 421 U.S. at 126 n.6.

An infringement upon an individual's right to speak in the future is irreparable harm; good-faith enforcement against past speech, even if protected, is not. *Fischer*, 78 F.4th at 868–69. Hess has not pointed to any speech that he wishes to express but for § 750.543m(1)(a)'s chilling effect. Because Hess fears only the ordinary inconveniences of defending a single, non-bad-faith prosecution based on a prior statement, the district court did not abuse its discretion in denying the requested relief. "The imminence of such a prosecution even though alleged to be unauthorized and hence unlawful is not alone ground for relief in equity." *Beal v. Mo. Pac. R.R. Corp.*, 312 U.S. 45, 49 (1941).

**III**

We need not consider the remaining *Winter* factors because Hess has failed to demonstrate a likelihood of irreparable harm, a "dispositive" prerequisite for obtaining preliminary injunctive relief. *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019). With confidence in the capacity of Michigan courts to justly resolve Hess's First Amendment defenses, if necessary, we **AFFIRM** the district court's denial of the requested preliminary injunction.